IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LAKE BURTON DEVELOPMENT, LLC; | ) | Case No. 09-22830 (PWB) |
| WATERFALL COUNTRY CLUB, LLC; and | ) | Case No. 10-21133 (PWB) |
| WATERFALL WATER AND SEWER, INC. | ) | Case No. 10-21134 (PWB) |
| | ) | |
| Debtors. | ) | Joint Administration Proposed |
| | ) | |

## MOTION OF THE DEBTORS FOR ENTRY OF ORDERS PURSUANT TO 11 U.S.C. §§ 105, 363, AND 365 (A) AUTHORIZING AND SCHEDULING AN AUCTION AT WHICH THE DEBTORS WILL SOLICIT THE HIGHEST OR BEST BID FOR THE SALE OF THEIR ASSETS; (B) APPROVING BID PROCEDURES GOVERNING THE PROPOSED SALE; AND (C) APPROVING THE SALE OF THE ASSETS TO THE PARTY SUBMITTING THE HIGHEST OR BEST BID

Lake Burton Development, LLC ("LBD"), Waterfall Country Club, LLC ("WCC") and

Waterfall Water and Sewer, Inc. ("Waterfall Water," and collectively with LBD and WCC, the

"Debtors") file this motion for entry of (i) following an initial, emergency hearing (the "Bid

Procedures Hearing"), an order (the "Bid Procedures Order") approving a sale and bidding

process as hereinafter described to be used in connection with the proposed sale of the assets (the

"Assets") comprising the Debtors' golf course and recreation complex operations and related real

estate development business (the "Business"), and (ii) following a final hearing (the "Sale

Hearing"), an order (the "Sale Order") approving the sale by the Debtors of the Assets to SELAF

Waterfall Holding Co., LLC ("SELAF") or to the bidder submitting the highest or best bid for the

Assets in connection with the sale and bidding process (the "Motion"). In support of this

Motion, the Debtors respectfully show the Court as follows:

**Jurisdiction**

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and

1334.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2).

**Background**

2.      LBD filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code

on July 10, 2009.  WCC and Waterfall Water filed their voluntary petitions for relief under

Chapter 11 of the Bankruptcy Code on March 15, 2010.

3.      On March 17, 2010, LBD, WCC and Waterfall Water filed substantially similar

motions with this Court seeking to have their respective bankruptcy estates jointly administered

pursuant to Federal Rule of Bankruptcy Procedure 1015(b).

4.      The Debtors have continued in possession of their properties and have continued

to operate and manage their businesses as debtors-in-possession pursuant to Sections 1107(a) and

1108 of the Bankruptcy Code.  No official committee of unsecured creditors has been appointed

in any of these cases, and no request has been made for the appointment of a trustee or examiner.

**Basis for Relief**

5.      The Debtors are currently engaged in operating the Business, including, without

limitation, managing and operating (a) the Waterfall Country Club (the "Club"), (b) the related

golf course and recreation complex, (c) the related real estate development business operations,

and (d) the related water and sewer operations.  Due in large part to the collapse of the real estate

market, over the past few years, the Business has experienced significant operating losses and

2

suffered from a lack of available capital and liquidity. As a result, the Debtors have been forced

to operate the Business under severe liquidity constraints and the Debtors have been unable to

take the steps necessary to run the Business in a profitable manner.

6.     Due to the challenges facing the Debtors, prior to filing the bankruptcy cases, the

Debtors began scrutinizing carefully the Business and began exploring strategic alternatives.

After evaluating their strategic alternatives, the Debtors concluded that it was not feasible to

refinance their current credit facilities and decided that their best alternative was to market for

sale the Business. A sale of the Business would permit the Debtors to monetize the Assets for

distribution to creditors and would permit the Club to be owned and operated by a new owner

that was better capitalized than the Debtors and had significant community development, sales

and management experience for projects like the Business. Therefore, the Debtors believe that a

sale of the Assets would yield significant benefits for their creditors, employees, estates and other

stakeholders (including members of the Club).

7.     In connection with a potential sale of the Business, the Debtors tried to identify

and contact all third party purchasers that might be interested in pursuing such a transaction.

Although the Debtors have not retained an investment banker or broker as part of the marketing

process, the Debtors' principal (Mr. J.T. Williams, Jr.) is an experienced real estate developer

who has considerable contacts in the real estate and investment community. As part of his efforts

to market the Business for sale, Mr. Williams contacted all prospective purchasers or investors

that he believed in good faith (a) have the financial wherewithal to consummate a transaction, (b)

are interested in investing in projects similar to the Business, and (c) were in a position to

complete a transaction expeditiously.

8.      The Debtors' efforts culminated in the negotiation and execution of a Purchase and Sale Agreement with SELAF dated March 17, 2010 (the "Agreement"), a true and correct copy of which is attached hereto as <u>Exhibit A</u>.[1]  The Agreement contemplates the sale of the Assets to SELAF (subject to higher or better bids) and contains the following material terms:

- Purchased Assets – The Assets include, without limitation, the following assets and rights related to the Business:  an 18-hole golf course, the sports club (including, without limitation, a pro shop, swimming pool, spa and workout facility), the lodge, 80 developed real property lots, all common area land and improvements, water and sewer facilities (including all assets used in connection with operating the water and sewer facilities and all rights to receive connection fees, monthly fees and other fees for water and sewer services), "required cash" (i.e., all fees, dues and deposits paid by Club members for the 2010 calendar year prior to closing <u>plus</u> other operating income received by the Debtors during the 2010 calendar year <u>less</u> the actual operating expenses for the Club that were paid between January 1, 2010 and the closing) and deposits, inventory, supplies, furniture, fixtures and equipment, accounts receivable, causes of action (including avoidance actions) and the proceeds thereof, intellectual property, other real property, books and records, permits, licenses, vehicles and other items presently used in the Business;

- Purchase Price – $10,525,000.00 (subject to a post-closing purchase price adjustment), paid in immediately available funds at closing ($625,000 of which will be escrowed to ensure payment of the Debtors' obligations under the Agreement including, without limitation, cure costs, delinquent real estate taxes and any post-closing purchase price adjustment);

- Assumed Liabilities – post-closing liabilities under assumed contracts, post-closing liabilities related to or arising from the Assets or the Business, and certain pro-rated costs, expenses and liabilities;

- Cure Costs – the Debtors are responsible for paying all "cure" amounts related to all contracts assumed by the Debtors and assigned to SELAF pursuant to the Agreement (the "Assumed Contracts");

- Deposit – $500,000, tendered on the execution date of the Agreement;

- Postclosing Indemnification by Debtors – none;

---

[1] The following description of the Agreement is qualified in its entirety by the language of the Agreement.  In the event there is any conflict between the description of the Agreement contained in this Motion and the provisions of the Agreement, the provisions of the Agreement shall govern and control.

- Consulting Agreement -- in connection with the closing, SELAF will enter into a consulting agreement with J.T. Williams, Jr. pursuant to which Mr. Williams will provide certain consulting services relating to the Business in exchange for consulting fees equal to $107,000 per year for the first five (5) years of the agreement and $57,000 per year thereafter; and

- Shoreline Usage Agreement -- in connection with the closing, SELAF will enter into an agreement granting SELAF and Club members the right to access and use certain lakefront property at Lake Burton in exchange for a payment of $30,000 per year for five years and $1 per year thereafter.

9.    The Agreement will be "tested" in the marketplace by the sale and bidding process described below so as to ensure that the estates realize the maximum value for the Assets.  The Debtors have developed the following proposed process for continuing to market the Assets for sale (the "Proposed Sale Process").  In connection therewith, the Debtors request that this Court approve the Proposed Sale Process, including the following bid procedures (the "Bid Procedures"):

(i)    <u>Initial Overbid</u>.  Any third party (other than SELAF) that is interested in acquiring the Assets must submit an "Initial Overbid" in conformance with the Bid Procedures by not later than 5:00 p.m. local time in Atlanta, Georgia on April 9, 2010 (the "Overbid Deadline").

(a)    Contain a signed definitive asset purchase agreement (together with a copy of the signed agreement that is marked to show changes from the Agreement) with, at a minimum, the following requirements: (i) having substantially identical terms and conditions as the Agreement, except with higher and better consideration; (ii) containing terms and conditions otherwise no less favorable to the Debtors' estates than the terms and conditions in the Agreement (provided that no Initial Overbid shall provide for the payment to the overbidder of any breakup fee, topping fee, expense reimbursement or other similar arrangement); (iii) provide for a cash purchase price equal to or greater than the sum of (1) $10,525,000.00, (2) the Breakup Fee (as defined below), and (3) $250,000; (iv) not be subject to any (1) financing contingency, (2) contingency relating to the completion of unperformed due diligence, (3) contingency relating to the approval of the overbidder's board of directors or other internal approvals or consents, or (4) any conditions precedent to the overbidder's obligation to purchase the Assets other than those included in the Agreement; and (v)

provide that the overbidder shall purchase all or substantially all of the Assets;

(b)    Include a cashiers' or certified check in the aggregate amount of the Deposit (i.e., $500,000), payable to an independent escrow agent to be designated by the Debtors (it being understood that deposits may also be sent by wire transfer of immediately available funds);

(c)    To the extent not previously provided to the Debtors, be accompanied by evidence satisfactory to the Debtors in their commercially reasonable discretion that the overbidder (i) is willing, authorized, capable and qualified financially, legally and otherwise, of unconditionally performing all obligations under the Agreement (or its equivalent) in the event that it submits the Prevailing Bid (as defined below) at the Auction (as defined below), and (ii) has substantial community development, sales and management experience for projects that are substantially similar to the Business (including the Club and the Development (as such term is defined in the Agreement));

(d)    Remain open and irrevocable until ten days after the entry of an order by the Court approving a definitive agreement providing for the sale of the Assets; and

(e)    Be submitted to (i) Lake Burton Development, LLC, Waterfall Country Club, LLC and Waterfall Water and Sewer, Inc., 300 Lester Mill Road, Suite 110, Locust Grove, Georgia 30248, Attention: J. T. Williams, Jr. (Facsimile: (770) 389-2010), (ii) counsel to the Debtors, George M. Geeslin, Eight Piedmont Center, Suite 550, 3525 Piedmont Road, N.E., Atlanta, Georgia 30305-1565 (Facsimile: (404) 816-1108), (iii) counsel to SELAF, King & Spalding LLP, 1180 Peachtree Street, Atlanta, Georgia 30309, Attention: Paul Ferdinands, Esq. (Facsimile: (404) 572-5100), and (iv) Office of the U.S. Trustee, 362 Richard Russell Bldg., 75 Spring Street, SW, Atlanta, Georgia 30303, Attention: James H. Morawetz (Facsimile: (404) 331-4464), in each case so as to be received not later than the Overbid Deadline.

(ii)    <u>Auction</u>.  In the event the Debtors timely receive a conforming Initial Overbid from a prospective purchaser as described above (a "Qualified Bidder"), then the Debtors will conduct an auction with respect to the sale of the Assets on April 12, 2010 beginning at 10:00 a.m. local time, at the offices of Debtors' counsel, George M. Geeslin, located at Eight Piedmont Center, Suite 550, 3525 Piedmont Road, N.E., Atlanta, Georgia 30305-1565, or at such other location as may be designated by the Debtors (the "Auction").  In order to participate in the Auction, each prospective purchaser shall be required to comply with the requirements of the Bid Procedures and to submit an Initial Overbid that is timely and that complies in all respects with the Bid Procedures Order.  At the Auction, Qualified Bidders and SELAF (it being understood that SELAF shall be deemed to be a Qualified Bidder) may submit successive bids in increments of at least $250,000

greater than the prior bid for the purchase of the Assets until there is only one offer that the Debtors determine (in the exercise of their reasonable discretion), subject to Court approval, is the highest or best offer for the Assets (the "Prevailing Bid"). When bidding at the Auction, SELAF shall receive a cash "credit" in the amount of the Breakup Fee. All bidding for the Assets will be concluded at the Auction and there will be no further bidding at the Sale Hearing. If no conforming Initial Overbid from a Qualified Bidder shall have been received at or prior to the Overbid Deadline, the Auction will not be held and the Sale Hearing will proceed with respect to the Agreement. In determining the Prevailing Bid, consideration will be given to, among other things: (a) the number, type and nature of any changes to the Agreement requested by each bidder; (b) the extent to which such modifications are likely to delay closing of the sale of the Assets and the cost to the Debtors of such modifications or delay; (c) the total consideration to be received by the Debtors; (d) the likelihood of the bidder's ability to close a transaction and the timing thereof; (e) the net benefit to the Debtors' estates; and (f) the amount of the bidder's community development, sales and management experience for projects that are substantially similar to the Business (including the Club and the Development). At the Auction, SELAF shall have the right to (i) submit further bids along with a markup of the Agreement; and (ii) at any time, request that the Debtors announce, subject to any potential new bids, the then current Prevailing Bid and, to the extent SELAF requests, use reasonable efforts to clarify any and all questions SELAF may have regarding the Debtors' announcement of the then current Prevailing Bid. Only the persons who submitted Initial Overbids and SELAF may participate in the Auction. After the Auction has concluded, the Debtors shall present to the Court for consideration and approval at the Sale Hearing the Prevailing Bid.

(iii)   <u>Breakup Fee</u>. In the event that the Agreement is terminated, the Debtors shall pay to SELAF cash in immediately available funds in an amount equal to $500,000 (the "Breakup Fee"); <u>provided</u>, <u>however</u>, that such Breakup Fee shall be due and payable only if (a) the Debtors shall have consummated a sale or other transfer of all or a material portion of the Assets to a person other than SELAF, (b) the Court shall have entered an order in the Debtors' bankruptcy cases confirming a plan of reorganization or liquidation for any of the Debtors which does not provide for a sale of the Assets to SELAF, (c) the Debtors shall have failed to conduct the Auction or the sale process in strict compliance with the Bid Procedures or if the Bid Procedures shall have been modified without SELAF's prior written consent thereto, or (d) there shall have occurred a material breach by the Debtors of any covenant, agreement, representation or warranty contained in the Agreement which results in the valid termination of the Agreement by SELAF; <u>provided</u>, <u>further</u>, that no Breakup Fee shall be due and payable by the Debtors in the event that a material breach by SELAF of any representation or warranty contained in the Agreement shall have occurred or SELAF fails to perform and comply with all of its covenants and agreements under the Agreement, which breach or failure, as applicable, results in a valid termination of the Agreement by the Debtors. In the event that the Breakup Fee is payable pursuant to clause (a) of the preceding

7

sentence, (1) the Breakup Fee shall be paid out of the sale proceeds received from a sale of Assets to such third party, and (2) no lien of any third party shall attach to the portion of the sale proceeds representing the Breakup Fee.  If the Breakup Fee becomes due and payable, it shall be paid to SELAF (without further order of the Court) within three (3) days of the event triggering payment of the Breakup Fee and shall be treated as an allowed administrative expense claim in the Debtors' bankruptcy cases.

(iv)    Sale Hearing.  The Sale Hearing will be conducted at 10:00 a.m. local time, on April 13, 2010 at the United States Bankruptcy Court, 75 Spring Street, S.W., Atlanta, Georgia 30303, at which time the Debtors intend to present the Prevailing Bid for approval by the Court pursuant to the provisions of Sections 105, 363(b), 363(f), 363(m), 363(n), and 365 of the Bankruptcy Code.  The Debtors shall be deemed to have accepted a bid only when the bid has been approved by the Court at the Sale Hearing.

(v)    Highest and/or Best Bid.  At all times during the Proposed Sale Process, the Debtors shall retain the right to determine, in their reasonable discretion, which bid constitutes the highest or otherwise best offer for the purchase of the Assets, and which bid should be selected as the Prevailing Bid, if any, all subject to final approval by the Court pursuant to the provisions of Section 363(b) of the Bankruptcy Code.  Without limiting the generality of the foregoing, the Debtors may, at any time before entry of an order of the Court approving a Prevailing Bid, reject any bid (other than the SELAF bid, as reflected in the Agreement) that, in the Debtors' reasonable discretion, the Debtors determine is (i) inadequate or insufficient, (ii) contrary to the requirements of the Bankruptcy Code or the Proposed Sale Process, (iii) from a bidder that does not have substantial community development, sales and management experience for projects that are substantially similar to the Business (including the Club and the Development), or (iv) otherwise contrary to the best interests of the Debtors, their estates or their creditors.

(vi)    Sale Implementation.  Following the approval of the Prevailing Bid at the Sale Hearing, the Debtors will be authorized and directed to take all commercially reasonable and necessary steps to complete and implement the transaction(s) contemplated by the Prevailing Bid, including (but not limited to) seeking entry of one or more Sale Orders.

10.    The Debtors believe that the Proposed Sale Process offers the best opportunity for the Debtors to maximize the value of the Business and the Assets for the benefit of their estates following reasonable and appropriate marketing efforts and, therefore, the Debtors believe that implementation of the Proposed Sale Process is in the best interests of the estates herein, and should be approved.

8

## Relief Requested

11.     By this Motion, the Debtors request that the Court grant the following relief:

(a)     Following the Bid Procedures Hearing, enter an order approving (i) the Proposed Sale Process and the Bid Procedures, including the procedures for submitting Initial Overbids, conducting the Auction, identifying the Prevailing Bid, and the payment of the Breakup Fee, and (ii) the Club Escrow (as such term is defined in the Agreement) arrangement; and

(b)     Following the Sale Hearing, enter the Sale Order approving the sale of the Assets and making the following findings and determinations, among others, with respect to such sale:

(i)     the Agreement is assumed by WCC and Waterfall Water pursuant to Section 365 of the Bankruptcy Code, and the Agreement and the transactions contemplated thereby are approved;

(ii)     SELAF shall have and acquire at the closing good, valid and marketable title to the Assets and the Assets shall be sold and conveyed to SELAF free and clear of any and all Liens, except for "Permitted Liens" and the "Assumed Liabilities" (as such terms are defined in the Agreement);

(iii)     Debtors shall assume and assign to SELAF all of the Assumed Contracts as of the closing date;

(iv)     Debtors shall, on or before the closing date, pay the Cure Costs to the appropriate parties as ordered by the Court so as to permit the assumption and assignment of all Assumed Contracts;

(v)     the Assumed Contracts shall be in full force and effect from and after the closing with non-debtor parties being barred and enjoined from asserting against SELAF, among other things, defaults, breaches or claims of pecuniary losses existing as of the closing or by reason of the closing;

(vi)     SELAF is acquiring the Assets free and clear of the "Excluded Liabilities" (as such term is defined in the Agreement) and providing for a full release of SELAF with respect to the Excluded Liabilities;

(vii)     the results of the Auction are approved;

(viii)     SELAF shall be found to be a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code; and

(iv)   the Court shall waive any stay that would otherwise be applicable to the immediate effectiveness of the Sale Order pursuant to Bankruptcy Rules 6004(g) and 6006(d).

## Argument

12.    As stated above, the Debtors believe that the Proposed Sale Process provides the Debtors with their best opportunity to preserve and maximize the value of the Business and the Assets for the benefit of their estates and, therefore, the Debtors believe that implementation of the Proposed Sale Process, and approval of any sale that is presented in accordance therewith, is in the best interests of the Debtors' creditors, employees, estates and other stakeholders (including members of the Club).  As such, the Debtors submit that approval of this Motion and the Proposed Sale Process is consistent with applicable law and should be granted.

**A.     Section 363(b) Authorizes the Proposed Sale and Sale Process.**

13.    Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Although Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets, in applying this section, courts have required that it be based upon the sound business judgment of the debtor.  See In re Chateaugay Corp., 973 F.2d 141 (2d Cir. 1992) (holding that a judge determining a § 363(b) application must find from the evidence presented before him a good business reason to grant such application); In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983) (same); Stephens Indus. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986) (holding that "bankruptcy court can authorize a sale of all of a chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such action"); In re Delaware & Hudson Ry. Co., 124 B.R. 169 (D. Del. 1991); In re Phoenix Steel

Corp, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that judicial approval of a § 363 sale
requires a showing that the proposed sale is fair and equitable, a good business reason exists for
completing the sale and that the transaction is in good faith).

14.     Although the Debtors cannot predict the results of the Proposed Sale Process and
the Auction, the Debtors respectfully submit that the proposed sale and Proposed Sale Process fit
squarely within the parameters of the sound business judgment test articulated in the above-
referenced authorities.

15.     First and foremost, the Debtors have articulated a sound business purpose for any
transaction emanating from the Auction.  As set forth above, the Debtors do not have sufficient
liquidity to continue to operate the Business and, in order to monetize the Assets for distribution
to creditors, it is critical that the Debtors be permitted to consummate a sale of the Assets
pursuant to the Proposed Sale Process.  The Debtors believe that the purchase price reflected in
the Agreement is fair and reasonable and the Debtors would be prepared to close a transaction
with SELAF even if no Initial Overbid is submitted by a competing bidder.

16.     The Debtors respectfully submit that the notice and timing of the Proposed Sale
Process are adequate and fair, and are reasonably calculated to elicit the highest levels of interest
in acquiring the Assets.  As described above, the Debtors have engaged in reasonable and
appropriate marketing of the Business and the Assets and strongly believe that their efforts,
coupled with the Proposed Sale Process outlined above, will garner the highest and best possible
value for the Assets.

17.     The Debtors have made, and will continue to make, diligent efforts to seek out all
potentially credible buyers, having already contacted numerous parties.  As in the case of
Delaware & Hudson Ry. Co., the substantial solicitation and marketing efforts of the Debtors

support the proposed process and the reasonableness of any offer ultimately presented through that process.

18.    Moreover, because the Proposed Sale Process will create a fair and reasonable environment in which all legitimate and qualified interest in the Business and Assets can be presented in a competitive, open and level playing field, any offer presented in accordance with the terms of the Proposed Sale Process will necessarily be negotiated and presented in good faith. In connection therewith, the Debtors will be prepared to present further evidence of good faith during the course of the Sale Hearing that will satisfy this Court and the mandates of Section 363(m) of the Bankruptcy Code.

19.    The Debtors intend to give notice of the Bid Procedures Hearing, the Auction, the Proposed Sale Process, the Sale Hearing and the proposed sale by the Debtors of the Assets, by mailing a copy of the Motion, on or before March 19, 2010, to (i) the Internal Revenue Service and each of the state and local taxing authorities listed on Exhibit B hereto at the addresses set forth on such Exhibit B; (ii) any parties who previously have expressed serious interest in acquiring all or substantially all of the Assets; (iii) counsel to the Debtors' prepetition secured lenders, as set forth on Exhibit C hereto at the addresses set forth on Exhibit C; (iv) all entities having requested notices pursuant to Bankruptcy Rule 2002; (v) the Office of United States Trustee for the Northern District of Georgia; (vi) all non-debtor parties to the executory contracts and unexpired leases to be assumed and assigned as part of the sale of the Business; (vii) all parties known by the Debtors to assert a Lien (as such term is defined in the Agreement) in the Assets; (viii) all governmental authorities exercising jurisdiction with respect to environmental matters affecting or relating to the Assets, as set forth on Exhibit D hereto at the addresses set forth on Exhibit D hereto; and (ix) the twenty largest unsecured creditors of each Debtor (the

persons listed in clauses (i) through (ix) are referred to collectively as the "Notice Parties"). In addition to the foregoing, the Debtors also propose to give additional notice by mailing a copy of any Bid Procedures Order entered by the Court within two business days of its entry to each of the Notice Parties. The Debtors submit that the foregoing is sufficient notice of the Auction, the Proposed Sale Process (if and in whatever form approved at the Bid Procedures Hearing), the Sale Hearing and the proposed sale by the Debtors of the Assets.

20.     By this Motion, the Debtors intend to sell the Business in order to monetize the Assets for distributions to their creditors. The Debtors strongly believe that, in furtherance of this goal, they have done all that is reasonably possible to secure the highest or best possible offer for the Assets under the circumstances, and believe that any sale must be consummated as promptly as practicable in order to prevent any erosion in value of the Assets. For all of the foregoing reasons, the relief requested in this Motion is a product of sound business judgment and is in the best interests of the Debtors, their creditors, employees, estates and other stakeholders (including members of the Club), and should be granted.

21.     Accordingly, the Debtors submit that the Proposed Sale Process, and any sale presented in accordance therewith, is warranted and appropriate under the terms and provisions of Section 363(b) of the Bankruptcy Code.

**B.      Section 363(f) Authorizes the Sale Free and Clear of Liens and Other Claims.**

22.     The Debtors request that the sale and transfer of the Assets be approved free and clear of all Liens, other than those specifically assumed by the party submitting the Prevailing Bid. Such relief is consistent with the provisions of Section 363(f) of the Bankruptcy Code in these cases.

23.    Section 363(f) provides that a debtor-in-possession may sell property free and

clear of any lien, claim or interest of another entity in such property if any of the following

circumstances pertain:

(1)    applicable non-bankruptcy law permits sale of such property free and clear of such interest;

(2)    such entity consents;

(3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)    such interest is in bona fide dispute; or

(5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

24.    As indicated by the use of the disjunctive term "or," satisfaction of any one of the

five requirements listed in Section 363(f) is sufficient to permit the sale of assets free and clear of

Liens.  See In re Elliott, 94 B.R. 343, 345 (E.D. Pa. 1988) (stating that Section 363(f) is written

in the disjunctive; the court may approve a sale "free and clear" provided that at least one of the

subsections is met).

25.    In this instance, the Debtors believe that their prepetition secured lenders are the

only entities holding or asserting a security interest in the Assets, and the Debtors anticipate that

the lenders will consent to the transaction presented for approval at the Sale Hearing.

26.    However, even if the lenders do not consent to the transaction presented for

approval at the Sale Hearing, the Debtors are permitted to sell the Assets free and clear of the

lenders' security interests because the proposed sale satisfies the provisions of Section 363(f)(3)

of the Bankruptcy Code.  Pursuant to the Agreement, the Debtors two primary prepetition

secured lenders, United Community Bank ("UCB") and State Mutual Insurance Co. ("State

Mutual"), will each receive cash payments at closing in an amount equal to the fair market value

of the collateral securing their respective claims. Specifically, UCB will receive $8,400,000 and

State Mutual will receive $1,500,000, in each case, in full satisfaction of all of claims and Liens

held by UCB and State Mutual against the Debtors and/or the Assets. In each case, the amount to

be received by UCB and State Mutual is greater than or equal to the fair market value of the

Assets against which UCB or State Mutual (as applicable) is claiming a first priority security

interest. Accordingly, the proposed sale satisfies the requirements of Section 363(f)(3) of the

Bankruptcy Code because the proceeds from the proposed sale will be greater than the aggregate

value of the Liens held by UCB and State Mutual on the Assets.[2]  See In re Atlanta Retail, Inc.

f/k/a Wolf Camera, Inc., 456 F.3d 1277 (11th Cir. 2003) (stating that the bankruptcy court had

held that the "value of all liens" referenced in Section 363(f)(3) is determined by the market

value of the underlying collateral and not the face value of the liens); In re Atlanta Retail, Inc.

f/k/a Wolf Camera, Inc., 297 B.R. 299 (Bankr. N.D. Ga. 2003) (J. Mullins) (same); In re Beker

Industries Corp., 63 B.R. 474 (Bankr. S.D.N.Y. 1986) (holding that the value of a lien is

determined by the value of the collateral securing such lien and not the face value of such lien).

27.     Moreover, the Debtors can also satisfy Section 363(f)(5) of the Bankruptcy Code.

Specifically, the "cram down" provision of Section 1129(b) of the Bankruptcy Code sets forth a

"legal or equitable proceeding" pursuant to which a secured creditor can be compelled to "accept

a money satisfaction" on account of its security interest in satisfaction of Section 363(f)(5) of the

Bankruptcy Code. See, e.g. In re Grand Slam U.S.A. Inc., 178 B.R. 460 (E.D. Mich. 1995)

(holding that "cram down" provisions of Section 1129(b) satisfy "legal or equitable proceeding"

---

[2] Other than the Liens held by UCB and State Mutual, the Debtors are not aware of any other
material consensual Liens held by any creditors against the Assets.

requirement of Section 363(f)(5)); In re Gulf States Steel, Inc. of Alabama, 285 B.R. 497 (Bankr.

N.D. Ala. 2002) (same); In re Terrace Chalet Apartments Ltd., 159 B.R. 821 (N.D. Ill. 1993)

(same); but see In re PW, LLC, 391 B.R. 25 (B.A.P. 9th Cir. 2008) (holding that "cram down"

provision of Section 1129(b) did not satisfy "legal or equitable" proceeding requirement of

Section 363(f)(5)).  However, under Section 1129(b) of the Bankruptcy Code, a secured creditor

is generally entitled to either (a) retain its security interest in its collateral, (b) receive payment(s)

on account of the value of its security interest (if any), or (c) have its security interest attach to

the net proceeds of the sale of its collateral.  See 11 U.S.C. §§ 1129(b)(2)(A)(i)-(ii); see also In re

Riverside Inv. P'ship, 674 F.2d 634, 640 (7th Cir. 1982) (holding that liens attach to sale

proceeds in same order and priority as liens held against collateral sold by trustee under prior

Bankruptcy Act).  In this case, the Debtors propose that (a) UCB and State Mutual will receive

the aforementioned payments at closing in full satisfaction of any Liens held by them, and (b) any

Liens in the Assets (other than Permitted Liens and Assumed Liabilities) held by creditors other

than UCB or State Mutual will attach to the net proceeds of the sale, subject to any claims and

defenses that the debtor may possess with respect thereto.

     28.     Additionally, because the Debtors have certain outstanding real property taxes

due and owing, all creditors holding a Lien in the real property Assets, including UCB and State

Mutual, could be compelled to accept a money satisfaction on account of their Liens.

Specifically, in the event that the taxing authority conducted a tax deed sale on account of the

Debtors' delinquent real property taxes and the purchaser of such tax deed filed the appropriate

pleadings to quiet title to the real property Assets, all Liens against the real property assets would

be "stripped" and such Liens would attach to any excess proceeds of the tax sale (i.e., any sale

proceeds in excess of the tax liability).  See O.C.G.A. §§ 48-40, et seq.

29.     Accordingly, the requirements of Section 363(f) of the Bankruptcy Code can be
satisfied, and the sale of the Assets free and clear of all Liens is appropriate.

**C.     The Prevailing Bidder Should Be Afforded All Protections Under Bankruptcy Code
Section 363(m) as a Good Faith Purchaser.**

30.     Section 363(m) of the Bankruptcy Code provides that "the reversal or
modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or
lease of property does not affect the validity of a sale or lease under such authorization to an
entity that purchased or leased such property in good faith . . ." 11 U.S.C. § 363(m).

31.     As discussed above, the Proposed Sale Process and the bidding procedures
contemplated as a part thereof (if and in whatever form approved at the Bid Procedures Hearing),
have been designed to create a fair, open and level playing field.  Accordingly, the Debtors
request that the party submitting the Prevailing Bid be determined to have acted in good faith and
be entitled to the protections of a good faith purchaser under Section 363(m) of the Bankruptcy
Code.  See, e.g., In re United Press Int'l, Inc., No. 91 B 13955 (FGC), 1992 U.S. Bankr. LEXIS
842, at *3 (Bankr. S.D.N.Y.  May 18, 1992).  In this regard, the transaction reflected in the
Agreement was negotiated by the parties at arm's length and in good faith, and SELAF and its
affiliates (i) are not "insiders" or affiliates of the Debtors, and (ii) do not have any relationship to
the Debtors that has not been fully disclosed to the Court.[3]

**D.     Section 365 Authorizes the Assumption and Assignment of Executory Contracts and
Unexpired Leases.**

32.     The Agreement also contemplates the assumption of certain executory contracts
and unexpired leases and the assignment of these contracts and leases to SELAF.  Accordingly,

---

[3] In an abundance of caution, the Debtors note that Dan DuPree (an executive with Reynolds
Capital Group, an affiliate of SELAF) is a member of the Club and serves as a member of the
Club's advisory board.

the Debtors also respectfully seek provisions in the Sale Order (i) authorizing the Debtors to

assume and assign the Assumed Contracts pursuant to Section 365 of the Bankruptcy Code, (ii)

fixing the cure amounts identified on Exhibit E hereto as the exact amounts that must be paid to

the non-debtor parties to the Assumed Contracts (the "Cure Costs"), (iii) authorizing and

directing the Debtors to pay the Cure Costs at the closing, and (iv) deeming the parties to the

Assumed Contracts adequately assured of future performance.

33.     Section 365(a) of the Bankruptcy Code provides that a debtor-in-possession

"subject to the court's approval, may assume or reject any executory contract or unexpired lease

of the debtor." 11 U.S.C. § 365(a).  Courts evaluate a decision to assume or reject an executory

contract or unexpired  lease under the "business judgment" standard.  See Chateaugay Corp, 973

F.2d at 141; see also In re Gardinier, Inc., 831 F.2d 974, 976 n.2 (11th Cir. 1987); In re Wells,

227 B.R. 553, 564 (Bankr. M.D. Fla. 1998); see also NLRB v. Bildisco & Bildisco, 465 U.S.

513, 523 (1984).  This standard is satisfied if the debtor determines in its business judgment that

the assumption or rejection of the contract or lease would benefit the estate.  See Sharon Steel

Corp. v. National Fuel Gas Distr. Corp., 872 F.2d 36, 39-40 (3d Cir. 1989); In re Bicoastal Corp.,

125 B.R. 658, 667 (Bankr. M.D. Fla. 1991).  The business judgment standard requires that the

court approve the debtor's business decision unless that judgment is the product of bad faith,

whim, or caprice.  See Lubrizol Enter. v. Richmond Metal Finishers, Inc., 756 F.2d 1043, 1047

(4th Cir. 1985); In re Prime Motor Inns, 124 B.R. 378, 383 (S.D. Fla. 1991).

34.     Here, the Assumed Contracts are integral assets of the Business, and the Debtors

have determined, in the exercise of their business judgment, that the assumption and assignment

of the Assumed Contracts in connection with a sale of the Assets is necessary to yield significant

value and benefit to the Debtors and their estates from the sale of the Assets.

35.     The Debtors also request that the Court fix the amount of Cure Costs due under the Assumed Contracts in connection with the requirement in Section 365(b)(1) of the Bankruptcy Code that the debtor in possession, at the time of assumption, cure defaults in any executory contract or unexpired lease being assumed, or provide adequate assurance that the default will be promptly cured.  In anticipation of the sale of the Business, the Debtors carefully reviewed their books and records, calculated all of the arrearages and overdue amounts owing on the Assumed Contracts, and determined that the Cure Costs identified on Exhibit E are the exact amounts that should be paid to the non-debtor parties to the Assumed Contracts.

36.     To the Debtors' knowledge, there are no defaults under the Assumed Contracts that are required to be cured or for which there is compensation due, other than the Cure Costs. The Debtors strongly believe that, in furtherance of the goal of maximizing value for their estates and creditors, they have done all that is possible to secure the highest or best possible offer for the Assets under the circumstances.   Accordingly, the Debtors respectfully request that this Court include in the Sale Order provisions (i) authorizing the Debtors to assume and assign the Assumed Contracts to SELAF (or to the party that submits the Prevailing Bid) pursuant to Section 365 of the Bankruptcy Code, (ii) fixing the Cure Costs as the exact amounts needed to cure any defaults under the Assumed Contracts, (iii) authorizing and directing the Debtors to pay the Cure Costs at the closing, and (iv) deeming the parties to the Assumed Contracts adequately assured of future performance by SELAF (or by the party that submits the Prevailing Bid).

E.     **The Proposed Bid Procedures and Breakup Fee Are Appropriate.**

37.     The Debtors have formulated a bidding process that the Debtors believe will induce prospective competing bidders to expend the time, energy and resources necessary to submit an Initial Overbid, and which the Debtors believe is fair and reasonable in view of the

assets to be sold.  The Proposed Sale Process and, in particular, the proposed Breakup Fee, are reasonable and supported by applicable case law.

38.    Historically, bankruptcy courts have approved bidding incentives, including break-up fees awarded to an initial bidder or "stalking horse," in the event of a successful overbid based on the business judgment of the debtor.  See, e.g., In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking"); In re Integrated Resources, Inc., 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (noting that "the business judgment of the Debtor is the standard applied under the law in this district" and applying the standard to a break-up fee).

39.    The Third Circuit Court of Appeals has also addressed the appropriate standard for determining whether proposed bidding incentives in the bankruptcy context are appropriate. In Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl Energy, Inc.), 181 F.3d 527 (3d Cir. 1999), the Court of Appeals held that even though bidding incentives are measured against a business judgment standard in nonbankruptcy transactions, the administrative expense provisions of Section 503(b) of the Bankruptcy Code govern bidding incentives in the bankruptcy context.  Finding no "compelling justification" for treating an application for break-up fees and expenses under Section 503(b) any differently from other applications for administrative expenses, the Court concluded that "the determination whether break-up fees or expenses are allowable under § 503(b) must be made in reference to general administrative expense jurisprudence.  In other words, the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate."  Id. at 535.

40.    In O'Brien, the Third Circuit identified at least two circumstances in which
bidding incentives may provide actual benefit to the estate, justifying administrative expense
status.  First, there exists an actual benefit to the estate where "assurance of a break-up fee
promoted more competitive bidding, such as by inducing a bid that otherwise would not have
been made and without which bidding would have been limited." Id. at 537.  Second, where the
availability of bidding incentives induces a prospective buyer to research the value of the debtor
and submit a bid that serves as a minimum bid on which other bidders can rely, the initial "bidder
may have provided a benefit to the estate by increasing the likelihood that the price at which the
Debtors is sold will reflect its true worth." Id.  Both of those circumstances exist in this case,
because the inducement of the Breakup Fee was critical in persuading SELAF to make an initial
offer, which will serve as a "floor" for other bidders in connection with the Proposed Sale
Process, and to expend the time and resources associated with conducting due diligence
regarding the Business and with negotiating and entering into the Agreement.

41.    Under the "administrative expense" standard enunciated in O'Brien, as well as the
"sound business judgment" standard followed in other jurisdictions, the Bid Procedures proposed
by the Debtors should be approved as fair and reasonable.  Moreover, the proposed Breakup Fee
of $500,000 is reasonable and generally consistent with the range of bidding protection typically
approved by bankruptcy courts in cases in this district.  See, e.g., In re Case Engineered Lumber,
Inc., No. 09-22499 (Bankr. N.D. Ga. September 1, 2009) (J. Brizendine) (approving break-up fee
equal to 3.5% of the cash purchase price and approving additional expense reimbursement in an
amount up to 2.0% of the cash purchase price); In re AtheroGenics, Inc., No. 08-78200 (Bankr.
N.D. Ga. March 17, 2009 ) (J. Massey) (approving break-up fee equal to 10% of the cash
purchase price and approving additional expense reimbursement in an amount up to 10% of the

21

cash purchase price); <u>In re Rhodes, Inc.</u>, No. 04-78434 (Bankr. N.D. Ga. July 26, 2005) (J.

Massey) (approving break-up fee equal to 2.5% of the cash purchase price); <u>In re Dan River, Inc.</u>,

No. 04-10990 (Bankr. N.D. Ga. Dec. 17, 2004) (J. Drake) (approving break-up fee equal to 5.3%

of the cash purchase price); <u>In re American Sports International, Ltd. d/b/a American Athletic,</u>

<u>Inc.</u>, No. 04-41108 (Bankr. N.D. Ga. June 4, 2004) (J. Bonapfel) (approving break-up fee equal

to 2.3% of the cash purchase price); <u>In re Centennial HealthCare Corporation</u>, No. 02-74974

(Bankr. N.D. Ga. July 3, 2003) (J. Massey) (approving expense reimbursement in an amount up

to 3.3% of the cash purchase price).

     42.     Furthermore, pursuant to the Agreement, if this Court does not enter a Bid

Procedures Order approving the Breakup Fee on or before April 1, 2010, SELAF may

immediately terminate the Agreement, in which case, SELAF shall no longer have any

obligations under the Agreement, including, without limitation, the obligation to purchase the

Assets from the Debtors.  Additionally, pursuant to the Agreement, the entry of a Bid Procedures

Order approving the Breakup Fee is a condition precedent that must be satisfied before SELAF is

obligated to close the transactions set forth in the Agreement.  Accordingly, if this Court does not

enter the Bid Procedures Order approving the Breakup Fee, SELAF shall not be obligated to

close the proposed transaction and purchase the Assets at closing (regardless of whether or not

SELAF terminates the Agreement).

     43.     Therefore, because the procedures and incentives included in the Proposed Sale

Process, including the proposed Breakup Fee, are fair and reasonable, are reasonably calculated

to produce the best and highest offers for the Assets and thereby confer actual benefits upon the

estates herein, and are within the range of incentives customarily approved by courts, such

procedures should be approved in these Chapter 11 cases.

**F.      The Club Escrow Arrangement Should Be Approved.**

44.      The Agreement contemplates that the "Club Escrow" will be established to hold

all dues, fees and deposits paid by Club members with respect to the 2010 calendar year, and that

funds will not be withdrawn from the Club escrow except to pay the Club's actual operating

expenses (as set forth in a schedule agreed to by SELAF and the Debtors) or as otherwise

approved by SELAF.  SELAF required that this provision be included in the Agreement because

of SELAF's concerns that the Club members' dues and deposits were being used to pay expenses

unrelated to the Club's operations.  This is a potentially serious problem, because Club dues are

required to be paid early in the year and then are used to fund the Club's operations for the entire

year.  Accordingly, the Debtors submit that the Club Escrow arrangement is reasonable and

appropriate and should be approved by the Court.

**Notice**

45.      This Motion will be served, and further notice of the Auction, the Proposed Sale

Process, the Sale Hearing and the proposed sale by the Debtors of the Assets will be given, in

accordance with the procedures set forth above.  The Debtors respectfully submit that such notice

is sufficient and proper under the circumstances, and that no other or further notice is required.

WHEREFORE, based upon the foregoing, the Debtors respectfully request that the Court

(a) enter an order following the Bid Procedures Hearing, substantially in the form attached hereto

as Exhibit F, (i) approving the Proposed Sale Process (including payment of the Breakup Fee)

and the Club Escrow arrangement, and (ii) authorizing the Debtors to take all actions reasonably

necessary to effectuate such Proposed Sale Process and the sale presented in accordance

therewith; (b) enter the Sale Order following the Sale Hearing, approving the highest or best bid

23

for the Assets and granting the other relief requested in this Motion; and (c) granting such other

and further relief as the Court deems just and proper.

This 17th day of March, 2010.

Respectfully submitted,

/s/ George M. Geeslin
George M. Geeslin
Eight Piedmont Center, Suite 550
3525 Piedmont Road, N.E.
Atlanta, GA 30305-1565
(404) 841-3464
Fax : (404) 816-1108

ATTORNEY FOR THE DEBTORS

# EXHIBIT A

## PURCHASE AND SALE AGREEMENT

See attached.

## EXHIBIT B

## TAXING AUTHORITIES

| | |
|---|---|
| Internal Revenue Service<br>Insolvency<br>Room 400 - Stop 334D<br>401 West Peachtree Street NW<br>Atlanta, GA 30308 | Bart L. Graham<br>State Revenue Commissioner<br>Georgia Department of Revenue<br>1800 Century Boulevard<br>Atlanta, GA 30345 |
| Internal Revenue Service<br>Centralized Insolvency Operations<br>PO Box 21126<br>Philadelphia, PA 19114 | Rabun County Tax Commissioner<br>Sandy Smith, Commissioner<br>25 Courthouse Square, Suite 149<br>Clayton, Georgia 30525-4114 |
| Georgia Department of Revenue<br>PO Box 105458<br>Atlanta, GA 30348-5458 | Georgia Department of Revenue<br>PO Box 105296<br>Atlanta, GA 30348-5296 |

## EXHIBIT C

### COUNSEL TO DEBTORS' PREPETITION SECURED LENDERS

| | |
|---|---|
| United Community Bank<br>c/o Paul G. Durdaller<br>Taylor English Duma LLP<br>1600 Parkwood Circle, Suite 400<br>Atlanta, Georgia  30339 | State Mutual Insurance Company<br>c/o Stephen Greenberg and<br>Melissa J. Perignat<br>Holt Ney Zatcoff & Wasserman<br>100 Galleria Parkway, Suite 600<br>Atlanta, Georgia 30339-5911 |
| Thomas E. Austin Jr.<br>Counsel for Mountain Valley Community<br>Bank<br>Thomas E. Austin, Jr., LLC<br>3490 Piedmont Road, N.E., Suite 1005<br>Atlanta, Georgia  30305 | |

## EXHIBIT D

## ENVIRONMENTAL AUTHORITIES

| | |
|---|---|
| Lisa P. Jackson<br>Administrator<br>United States Environmental Protection Agency<br>Ariel Rios Building<br>1200 Pennsylvania Avenue, N.W.<br>Washington, DC 20460<br>(202) 272-0167 | Lt. Gen. Robert L. Van Antwerp<br>Commander<br>United States Army Corps of Engineers<br>441 G Street, NW<br>Washington, DC  20314-1000<br>(202) 761-0011 |
| Rabun County Board of Commissioners<br>Rabun County Courthouse<br>25 Courthouse Square<br>Clayton, Georgia  30525<br>(706) 782-3615 | Allen Barnes<br>Director<br>Environmental Protection Division<br>Georgia Department of Natural Resources<br>2 Martin Luther King Drive<br>Suite 1152, East Tower<br>Atlanta, Georgia  30334 |
| Rabun County Marshal's Office<br>25 Courthouse Square<br>Clayton, GA 30525 | Environmental Protection Division<br>Georgia Department of Natural Resources<br>16 Carter Road<br>Cartersville, GA 30121 |
| A. Stanley Meiburg<br>Acting Regional Administrator<br>United States Environmental Protection Agency<br>Region IV<br>Atlanta Federal Center<br>61 Forsyth Street, SW<br>Atlanta, GA 30303-3104<br>Phone: (404) 562-9900 | Maj. Gen. Todd T. Semonite<br>South Atlantic Division Commander<br>United States Army Corps of Engineers<br>Room 9M15, 60 Forsyth Street, SW<br>Atlanta, Georgia  30303-8801<br>(404) 562-5011 |
| Georgia Department of Natural Resources<br>PO Box 105310<br>Atlanta, GA 30348-5310 | |

## EXHIBIT E

## ASSUMED CONTRACTS AND CURE AMOUNTS

| Debtor Party | Counter Party | Contract Description | Cure Amount |
|---|---|---|---|
| WFCC, LLC | National City Golf Finance (PNC Equipment Finance) | Golf/ Landscape Maintenance Equipment | $4,187.22 |
| Lake Burton, LLC dba WFCC | VGM Financial Services | Golf/ Landscape Maintenance Equipment | $0.00 |
| Lake Burton, LLC dba WFCC | VGM Financial Services | Golf Carts | $0.00 |
| Killearn, Inc. dba WFCC | Wells Fargo Financial Leasing, Inc. (# 019-0000043-036) | Golf/ Landscape Maintenance Equipment | $0.00 |
| Killearn, Inc. dba WFCC | Wells Fargo Financial Leasing, Inc. (# 019-0000043-035) | Golf/ Landscape Maintenance Equipment | $0.00 |
| Killearn, Inc. dba WFCC | Wells Fargo Financial Leasing, Inc. (# 019-0000043-038) | Golf/ Landscape Maintenance Equipment | $0.00 |
| LBD, LLC | Ingersoll Rand (now Colonial Pacific Leasing) | Golf Carts | $0.00 |
| Killearn, Inc. dba WFCC | Wells Fargo Financial Leasing, Inc. | Used John Deere HPX Gator | $0.00 |
|  | John Deere Credit | Equipment | $0.00 |
| WFCC, LLC | FastSource Leasing | Kitchen equipment | $0.00 |
| LBD, LLC | Ford Credit | 2005 Chevrolet Silverado K150 | $1,653.79 |
| LBD, LLC | Ford Credit | 2006 Ford F150 | $0.00 |
| LBD, LLC | Ford Credit | 2005 Ford F150 | $0.00 |
| LBD, LLC | Ford Credit | 2008 Ford LGT CONVTNL 'F | $0.00 |
| WFCC, LLC | Tamco (#006-0022145-001) | Phone Equipment | $0.00 |

<u>EXHIBIT F</u>

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **LAKE BURTON DEVELOPMENT, LLC;** | ) | **Case No. 09-22830 (PWB)** |
| **WATERFALL COUNTRY CLUB, LLC; and** | ) | **Case No. 10-21133 (PWB)** |
| **WATERFALL WATER AND SEWER, INC.** | ) | **Case No. 10-21134 (PWB)** |
| | ) | |
| **Debtors.** | ) | **Joint Administration Proposed** |
| | ) | |

## ORDER (A) AUTHORIZING AND SCHEDULING AN AUCTION AT WHICH THE DEBTORS WILL SOLICIT THE HIGHEST OR BEST BID FOR THE SALE OF THEIR ASSETS; AND (B) APPROVING BID PROCEDURES GOVERNING THE PROPOSED SALE, INCLUDING PAYMENT OF BREAKUP FEE

Upon consideration of the motion dated March 17, 2010 (the "Motion"),[1] of Lake Burton

Development, LLC, Waterfall Country Club, LLC and Waterfall Water and Sewer, Inc.

(collectively, the "Debtors"), for entry of (i) following an initial, emergency hearing, an order

approving a sale and bidding process as hereinafter described to be used in connection with the

proposed sale of the assets (the "Assets") comprising the Debtors' golf course and recreation

complex operations and related real estate development business (the "Business"), and (ii)

following a final hearing, an order approving the sale by the Debtors of the Assets to SELAF

Waterfall Holding Co., LLC ("SELAF") or to the bidder submitting the highest or best bid for

the Assets in connection with the sale and bidding process; and an interim hearing regarding the

Motion having been held on [March 30], 2010 (the "Bid Procedures Hearing"); and based upon

all of the evidence proffered or adduced at the Bid Procedures Hearing; and after consideration

of any memoranda, objections, or other pleadings filed in connection with the Bid Procedures

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

6844280.1

Hearing; and after consideration of the arguments of counsel made at the Bid Procedures

Hearing; and upon the entire record of these cases; and it appearing that the approval of the Bid

Procedures as requested in the Motion is in the best interests of the Debtors, their estates and

creditors; and after due deliberation thereon; and good and sufficient cause appearing therefor, it

is hereby

FOUND AND DETERMINED THAT:

A.    The form and manner of notice of the Bid Procedures and the Bid Procedures

Hearing shall be, and hereby are, approved as sufficient and adequate notice.  No other or further

notice in connection with the entry of this Order is or shall be required.

B.    The Bid Procedures were proposed by the Debtors in good faith with the goal of

maximizing the value of the Business and the Assets for the benefit of all creditors of their

estates.

C.    Approval of the Breakup Fee and entry of this Order is (i) a necessary and

appropriate inducement to SELAF to (1) make an initial offer which will serve as a "floor" for

further bidding, and (2) to negotiate and enter into the Agreement and consummate the

transactions contemplated thereby, and (ii) a condition precedent to closing the transactions

contemplated by the Agreement.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED

THAT:

1.    The Motion is granted to the extent set forth in this Order.  The following "Bid

Procedures" are hereby approved and shall be used in connection with the proposed sale of the

Assets:

(i)    Initial Overbid.  Any third party (other than SELAF) that is interested in acquiring
      the Assets must submit an "Initial Overbid" in conformance with the Bid

Procedures by not later than 5:00 p.m. local time in Atlanta, Georgia on April [9], 2010 (the "Overbid Deadline").  Any such Initial Overbid must:

(a)    Contain a signed definitive asset purchase agreement (together with a copy of the signed agreement that is marked to show changes from the Agreement) with, at a minimum, the following requirements: (i) having substantially identical terms and conditions as the Agreement, except with higher and better consideration; (ii) containing terms and conditions otherwise no less favorable to the Debtors' estates than the terms and conditions in the Agreement (provided that no Initial Overbid shall provide for the payment to the overbidder of any breakup fee, topping fee, expense reimbursement or other similar arrangement); (iii) provide for a cash purchase price equal to or greater than the sum of (1) $10,525,000.00, (2) the Breakup Fee (as defined below), and (3) $250,000; (iv) not be subject to any (1) financing contingency, (2) contingency relating to the completion of unperformed due diligence, (3) contingency relating to the approval of the overbidder's board of directors or other internal approvals or consents, or (4) any conditions precedent to the overbidder's obligation to purchase the Assets other than those included in the Agreement; and (v) provide that the overbidder shall purchase all or substantially all of the Assets;

(b)    Include a cashiers' or certified check in the aggregate amount of the Deposit (i.e., $500,000), payable to an independent escrow agent to be designated by the Debtors (it being understood that deposits may also be sent by wire transfer of immediately available funds);

(c)    To the extent not previously provided to the Debtors, be accompanied by evidence satisfactory to the Debtors in their commercially reasonable discretion that the overbidder (i) is willing, authorized, capable and qualified financially, legally and otherwise, of unconditionally performing all obligations under the Agreement (or its equivalent) in the event that it submits the Prevailing Bid (as defined below) at the Auction (as defined below), and (ii) has substantial community development, sales and management experience for projects that are substantially similar to the Business (including the Club and the Development (as such term is defined in the Agreement));

(d)    Remain open and irrevocable until ten days after the entry of an order by the Court approving a definitive agreement providing for the sale of the Assets; and

(e)    Be submitted to (i) Lake Burton Development, LLC, Waterfall Country Club, LLC and Waterfall Water and Sewer, Inc., 300 Lester Mill Road, Suite 110, Locust Grove, Georgia 30248, Attention: J. T. Williams, Jr. (Facsimile: (770) 389-2010), (ii) counsel to the Debtors, George M.

Geeslin, Eight Piedmont Center, Suite 550, 3525 Piedmont Road, N.E.,
Atlanta, Georgia 30305-1565 (Facsimile: (404) 816-1108), (iii) counsel to
SELAF, King & Spalding LLP, 1180 Peachtree Street, Atlanta, Georgia
30309, Attention: Paul Ferdinands, Esq. (Facsimile: (404) 572-5100), and
(iv) Office of the U.S. Trustee, 362 Richard Russell Bldg., 75 Spring
Street, SW, Atlanta, Georgia 30303, Attention: James H. Morawetz
(Facsimile: (404) 331-4464), in each case so as to be received not later
than the Overbid Deadline.

(ii)     Auction.  In the event the Debtors timely receive a conforming Initial Overbid
from a prospective purchaser as described above (a "Qualified Bidder"), then the
Debtors will conduct an auction with respect to the sale of the Assets on April
[12], 2010 beginning at 10:00 a.m. local time, at the offices of Debtors' counsel,
George M. Geeslin, located at Eight Piedmont Center, Suite 550, 3525 Piedmont
Road, N.E., Atlanta, Georgia 30305-1565, or at such other location as may be
designated by the Debtors (the "Auction").  In order to participate in the Auction,
each prospective purchaser shall be required to comply with the requirements of
the Bid Procedures and to submit an Initial Overbid that is timely and that
complies in all respects with the Bid Procedures Order.  At the Auction, Qualified
Bidders and SELAF (it being understood that SELAF shall be deemed to be a
Qualified Bidder) may submit successive bids in increments of at least $250,000
greater than the prior bid for the purchase of the Assets until there is only one
offer that the Debtors determine (in the exercise of their reasonable discretion),
subject to Court approval, is the highest or best offer for the Assets (the
"Prevailing Bid").  When bidding at the Auction, SELAF shall receive a cash
"credit" in the amount of the Breakup Fee.  All bidding for the Assets will be
concluded at the Auction and there will be no further bidding at the Sale Hearing.
If no conforming Initial Overbid from a Qualified Bidder shall have been received
at or prior to the Overbid Deadline, the Auction will not be held and the Sale
Hearing will proceed with respect to the Agreement.  In determining the
Prevailing Bid, consideration will be given to, among other things: (a) the
number, type and nature of any changes to the Agreement requested by each
bidder; (b) the extent to which such modifications are likely to delay closing of
the sale of the Assets and the cost to the Debtors of such modifications or delay;
(c) the total consideration to be received by the Debtors; (d) the likelihood of the
bidder's ability to close a transaction and the timing thereof; (e) the net benefit to
the Debtors' estates; and (f) the amount of the bidder's community development,
sales and management experience for projects that are substantially similar to the
Business (including the Club and the Development).  At the Auction, SELAF
shall have the right to (i) submit further bids along with a markup of the
Agreement; and (ii) at any time, request that the Debtors announce, subject to any
potential new bids, the then current Prevailing Bid and, to the extent SELAF
requests, use reasonable efforts to clarify any and all questions SELAF may have
regarding the Debtors' announcement of the then current Prevailing Bid.  Only
the persons who submitted Initial Overbids and SELAF may participate in the

Auction.  After the Auction has concluded, the Debtors shall present to the Court for consideration and approval at the Sale Hearing the Prevailing Bid.

(iii)    <u>Sale Hearing</u>.  The Sale Hearing will be conducted at [10:00 a.m.] local time, on April [13], 2010 at the United States Bankruptcy Court, 75 Spring Street, S.W., Atlanta, Georgia 30303, at which time the Debtors intend to present the Prevailing Bid for approval by the Court pursuant to the provisions of Sections 105, 363(b), 363(f), 363(m), 363(n), and 365 of the Bankruptcy Code.  The Debtors shall be deemed to have accepted a bid only when the bid has been approved by the Court at the Sale Hearing.

(iv)    <u>Highest and/or Best Bid</u>.  At all times during the Proposed Sale Process, the Debtors shall retain the right to determine, in their reasonable discretion, which bid constitutes the highest or otherwise best offer for the purchase of the Assets, and which bid should be selected as the Prevailing Bid, if any, all subject to final approval by the Court pursuant to the provisions of Section 363(b) of the Bankruptcy Code.  Without limiting the generality of the foregoing, the Debtors may, at any time before entry of an order of the Court approving a Prevailing Bid, reject any bid (other than the SELAF bid, as reflected in the Agreement) that, in the Debtors' reasonable discretion, the Debtors determine is (i) inadequate or insufficient, (ii) contrary to the requirements of the Bankruptcy Code or the Proposed Sale Process, (iii) from a bidder that does not have substantial community development, sales and management experience for projects that are substantially similar to the Business (including the Club and the Development), or (iv) otherwise contrary to the best interests of the Debtors, their estates or their creditors.

(i)    <u>Sale Implementation</u>.  Following the approval of the Prevailing Bid at the Sale Hearing, the Debtors will be authorized and directed to take all commercially reasonable and necessary steps to complete and implement the transaction(s) contemplated by the Prevailing Bid, including (but not limited to) seeking entry of one or more Sale Orders.

2.    Objections (if any) to approval of any Prevailing Bid or to approval of any proposed sale of the Assets, or any proposed assumption and assignment of executory contracts and unexpired leases (including as to Cure Costs) pursuant to any Prevailing Bid, shall be in writing, shall set forth the name of the objecting party, the basis for the objection and the specific grounds therefor, and shall be filed with the Court and served upon each of the following so as to be actually received on or before 5:00 p.m. on April [12], 2010: (i) Lake Burton Development, LLC, Waterfall Country Club, LLC and Waterfall Water & Sewer, Inc., 300 Lester Mill Road,

Suite 110, Locust Grove, Georgia 30248, Attention: J. T. Williams, Jr. (Facsimile: (770) 389-

2010), (ii) counsel to the Debtors, George M. Geeslin, Eight Piedmont Center, Suite 550, 3525

Piedmont Road, N.E., Atlanta, Georgia 30305-1565 (Facsimile: (404) 816-1108), (iii) counsel to

SELAF, King & Spalding LLP, 1180 Peachtree Street, Atlanta, Georgia 30309, Attention: Paul

Ferdinands, Esq. (Facsimile: (404) 572-5100), and (iv) Office of the U.S. Trustee, 362 Richard

Russell Bldg., 75 Spring Street, SW, Atlanta, Georgia 30303, Attention: James H. Morawetz

(Facsimile: (404) 331-4464).  Any objection not filed and served in accordance with this

paragraph 2 shall be deemed waived and shall be forever barred.

   3.  The failure of any third party to file and serve an objection as ordered and

directed herein shall be deemed the consent of such party to the granting of the Motion and the

sale and transfer of the Assets (including the assumption and assignment of executory contracts

and unexpired leases, including applicable Cure Costs, under the Prevailing Bid).

   4.  The provisions of Section 8.2 of the Agreement are hereby approved and shall be

binding on the Debtors, and their estates, creditors and other stakeholders.  Without limiting the

generality of the foregoing, the Debtors are authorized to pay to SELAF an amount equal to

$500,000 (the "Breakup Fee"); provided, however, that such Breakup Fee shall be due and

payable only if (a) the Debtors shall have consummated a sale or other transfer of all or a

material portion of the Assets to a person other than SELAF, (b) the Court shall have entered an

order in the Debtors' bankruptcy cases confirming a plan of reorganization or liquidation for any

of the Debtors which does not provide for a sale of the Assets to SELAF, (c) the Debtors shall

have failed to conduct the Auction or the sale process in strict compliance with the Bid

Procedures or if the Bid Procedures shall have been modified without SELAF's prior written

consent thereto, or (d) there shall have occurred a material breach by the Debtors of any

6

covenant, agreement, representation or warranty contained in the Agreement which results in the valid termination of the Agreement by SELAF; provided, further, that no Breakup Fee shall be due and payable by the Debtors in the event that a material breach by SELAF of any representation or warranty contained in the Agreement shall have occurred or SELAF fails to perform and comply with all of its covenants and agreements under the Agreement, which breach or failure, as applicable, results in a valid termination of the Agreement by the Debtors.

5.    In the event that the Breakup Fee is payable pursuant to clause (a) of the preceding paragraph, (a) the Breakup Fee shall be paid out of the sale proceeds received from a sale of Assets to such third party, and (b) no lien of any third party shall attach to the portion of the sale proceeds representing the Breakup Fee.

6.    If the Breakup Fee becomes due and payable, it shall be paid to SELAF (without further order of the Court) within three (3) days of the event triggering payment of the Breakup Fee and shall be treated as an allowed administrative expense claim in the Debtors' bankruptcy cases.

7.    The Bid Procedures (including the Breakup Fee) are fair and reasonable, are reasonably calculated to produce the best and highest offers for the Assets, and will confer actual benefits upon the Debtors' estates.  The Bid Procedures (including payment of the Breakup Fee, if applicable) represent an exercise of the Debtors' sound business judgment and will facilitate an orderly sale process.

8.    The provisions of Section 3.8 of the Agreement are hereby approved and shall be binding upon the Debtors and their estates, creditors and other stakeholders.  Without limiting the generality of the foregoing, the Debtors shall not spend, transfer or use any membership dues,

fees or deposits received from Club members for the 2010 calendar year except in strict

compliance with the provisions of Section 3.8 of the Agreement.

      9.     The Debtors shall serve a copy of this Order as contemplated in the Motion.

**SO ORDERED.**

At Atlanta, Georgia this _____ day of [March], 2010.

Prepared and presented by:

George M. Geeslin
Eight Piedmont Center, Suite 550
3525 Piedmont Road, N.E.
Atlanta, GA 30305-1565
(404) 841-3464
Fax : (404) 816-1108

ATTORNEY FOR THE DEBTORS